IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
WESTERN DIVISION


- - - - - - - - - - - - X
UNITED STATES OF AMERICA, :          <u>REDACTED TRANSCRIPT</u>
                         :
      Plaintiff,         :
                         :
vs.                      :          Criminal No. 1:18-cr-00079
                         :
BRIAN LEE RHODES,        :          <u>SENTENCING HEARING TRANSCRIPT</u>
                         :
      Defendant.         :
- - - - - - - - - - - - X


                              Courtroom, Third Floor
                              U.S. Courthouse
                              8 South Sixth Street
                              Council Bluffs, Iowa
                              Wednesday, October 16, 2019
                              11:01 a.m.


BEFORE:  THE HONORABLE REBECCA GOODGAME EBINGER, Judge.


APPEARANCES:

For the Plaintiff:        SHELLY M. SUDMANN, ESQ.
                          Assistant U.S. Attorney
                          P.O. Box 1887
                          Council Bluffs, Iowa  51502-1887


For the Defendant:        BRADLEY R. HANSEN, ESQ.
                          Assistant Federal Public Defender
                          701 Pierce Street, Suite 400
                          Sioux City, Iowa  51101




                KELLI M. MULCAHY, CSR, RDR, CRR
                   United States Courthouse
                123 East Walnut Street, Room 115
                   Des Moines, Iowa 50309

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|

For the Government:

Robert Larsen                    16

E X H I B I T S

| GOVERNMENT'S EXHIBITS | OFFERED | RECEIVED |
|-----------------------|---------|----------|
| 1 - DVD | 22 | 22 |
| 2 - Screenshots | 22 | 22 |
| 3 - Facebook records | 22 | 22 |
| 4 - Facebook records | 22 | 22 |

| DEFENDANT'S EXHIBITS | OFFERED | RECEIVED |
|----------------------|---------|----------|
| A-1 - Letter of support | 32 | 32 |
| A-2 - Letter of support | 32 | 32 |
| A-3 - Letter of support | 32 | 32 |
| A-4 - Letter of support | 32 | 32 |
| A-5 - Letter of support | 32 | 32 |

1         P R O C E E D I N G S

2         (In open court, with the defendant present.)

3         THE COURT:  Thank you.  Please be seated.

4     We are here in the matter of the United States of America

5 vs. Brian Lee Rhodes.  This is Case No. 1:18-cr-79.  This is the

6 time and date set for sentencing in this matter.  My name is

7 Rebecca Goodgame Ebinger.  I'm the district judge presiding.

8     Will counsel please identify themselves for purposes of the

9 record.

10         MS. SUDMANN:  Shelly Sudmann representing the United

11 States, and to my left is Special Agent Robert Larsen with the

12 Department of Criminal Investigation.

13         MR. HANSEN:  Brad Hansen for Defendant Brian Rhodes,

14 who is personally present, Your Honor.  Good morning.

15         THE COURT:  Good morning.  Thank you.

16     And we have with us from the United States Probation Office

17 the author of the Presentence Investigation Report, Probation

18 Officer Daniel Prather.

19     Mr. Rhodes, do you recall appearing before United States

20 Magistrate Judge Bremer on June 6th of this year and entering

21 pleas of guilty to Counts 1, 2, 3, and 5 of the six-count

22 superseding indictment that had been filed on February 26th of

23 this year?

24         THE DEFENDANT:  Yes.

25         THE COURT:  I'm going to go over those counts with

4

1   you.  The first count alleged coercion and enticement of a minor

2   in violation of Title 18, United States Code, Section 22 --

3   excuse me -- 2422(b); the second count alleged the same crime

4   against a different victim, coercion and enticement of a minor;

5   the third count included the same crime, coercion and enticement

6   of a minor, with a separate victim; and the fifth count alleged

7   distribution of child pornography in violation of Title 18,

8   United States Code, Sections 2252(a)(2) and 2252(b)(1).

9        Do you recall that, sir?

10            THE DEFENDANT:  Yes.

11            THE COURT:  At the time of your plea, the magistrate

12   judge presiding, Judge Bremer, advised you that each one of

13   these counts carries a mandatory minimum term of imprisonment.

14   For Counts 1, 2, and 3, it's a ten-year mandatory minimum term

15   of imprisonment with up to life imprisonment; and for Count 5,

16   it's a five-year mandatory minimum with up to 20 years.

17        Do you recall that?

18            THE DEFENDANT:  Yeah.

19            THE COURT:  And you were advised at that time that the

20   sentences could be imposed concurrently, or at the same time, or

21   consecutively, meaning back to back.  Do you recall that, sir?

22            THE DEFENDANT:  Yes.

23            THE COURT:  Additionally, you were advised of the

24   mandatory minimums associated with the terms of supervised

25   release applicable to these offenses as well, correct?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Magistrate Judge Bremer recommended that

3    your plea of guilty be accepted, and District Judge Rose

4    accepted your plea and adjudicated you guilty on July 1st of

5    this year.

6       Do you understand, sir, that you're here today for the

7    purpose of being sentenced on those counts that we've just

8    discussed?

9          THE DEFENDANT:  Yes.  Yes.

10          THE COURT:  Do you still acknowledge that you are,

11   indeed, guilty of each of the crimes charged in Counts 1, 2, 3,

12   and 5?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Before I proceed further with the hearing,

15   I need to make sure that you're fully able to participate here

16   today.

17      Are you currently under the influence of alcohol?

18          THE DEFENDANT:  No.

19          THE COURT:  Are you under the influence of any illegal

20   substances?

21          THE DEFENDANT:  No.

22          THE COURT:  Are you taking any prescription

23   medications?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Can you tell me about that, sir?

1          THE DEFENDANT:  It's just my thyroid medication and my

2    asthma inhaler.

3          THE COURT:  In the Presentence Investigation Report,

4    there is indication in paragraph 116 that you have some ailments

5    and that you're taking some medications.  Are those the

6    medications that you're taking, sir?

7          THE DEFENDANT:  I do have a medication I'm supposed to

8    take, but as of right now I'm only taking, as I previously

9    stated, my thyroid and my asthma inhaler.

10          THE COURT:  Okay.  Is there anything about your use of

11    those medications that would negatively affect your ability to

12    understand and participate in this hearing?

13          THE DEFENDANT:  No.

14          THE COURT:  Is there anything about your lack of use

15    of the other substances you mentioned that you sometimes take

16    that would negatively affect your ability to understand and

17    participate --

18          THE DEFENDANT:  No.

19          THE COURT:  -- in this hearing?

20          THE DEFENDANT:  No.

21          THE COURT:  Are you suffering from any physical or

22    mental ailment that would make it difficult for you to

23    understand and participate in this hearing?

24          THE DEFENDANT:  No.

25          THE COURT:  If at any time in this hearing,

1  Mr. Rhodes, you do not understand something I say or you have a

2  question, would you please stop me and let me know?

3          THE DEFENDANT:  Yes.

4          THE COURT:  The most important thing is that you

5  understand the proceeding.

6          THE DEFENDANT:  Okay.

7          THE COURT:  In anticipation of this hearing, the

8  United States Probation Office prepared a Presentence

9  Investigation Report.  I have reviewed that report.  I have also

10  reviewed the sentencing memoranda filed by the parties.

11      I received proposed exhibits by the parties.  The

12  Government provided a video identified as Government's Exhibit

13  1; and Government Exhibit 2, which was some photographs; and

14  then Government's Exhibit 3, separate photograph -- separate

15  photographs, and then the exchange of text messages, I think,

16  are also not separately identified but connected to that Exhibit

17  3; and then Exhibit 4 is a photograph and then an exchange of

18  text messages as well.  I have reviewed the video and those

19  documents prior to today's hearing.

20      I have also received from the defense proposed sentencing

21  exhibits, Defendant's Exhibits A-1 through A-5.  I did receive

22  A-5 this morning and have had the opportunity to read that

23  before the hearing.

24      I have reviewed the material related to the plea, the

25  charging documents, and forfeiture in this case.

1    Are there any other materials that need to be brought to my

2  attention?

3         MS. SUDMANN:  No, Your Honor.

4         THE COURT:  Ms. Sudmann, I haven't received anything

5  in terms of victim impact statements or requests for

6  restitution.  Is the Government aware of any such documents or

7  requests at this time?

8         MS. SUDMANN:  Your Honor, the Government hasn't

9  received any restitution statements.  The Government does have

10  four impact statements to be read in court.

11         THE COURT:  And those have been provided to you from

12  the victims, and their request for their production is for them

13  to be orally read?

14         MS. SUDMANN:  Yes.

15         THE COURT:  Thank you.

16     Mr. Hansen?

17         MR. HANSEN:  Nothing else, Your Honor.

18         THE COURT:  Thank you.

19     So let's turn our attention, then, to the Presentence

20  Investigation Report.

21     Ms. Sudmann, have you had the opportunity to review the

22  report on behalf of the United States?

23         MS. SUDMANN:  Yes, Your Honor.

24         THE COURT:  And does the Government have any

25  outstanding factual objections, corrections, or omissions to

1  bring to the Court's attention?

2          MS. SUDMANN:  The Government doesn't -- the Government

3  has one correction to make.  In review of the defendant's

4  objections to paragraph 33, the Government would like to correct

5  the very -- almost the last little bit of the sentence.  Instead

6  of the part where it says the little sister put her hands down

7  P.S.'s pants, it should say her little sister touched the area,

8  the vaginal area, outside P.S.'s pants, on the outside, not on

9  the inside.

10          THE COURT:  Do you agree with that correction,

11  Mr. Hansen?

12          MR. HANSEN:  Yes, Your Honor.

13          THE COURT:  Having watched the video, I would concur.

14      So the judgment will reflect that paragraph 33 is amended

15  for the last clause to say "her little sister touched the

16  vaginal area on the outside of P.S.'s pants."

17      Mr. Hansen, have you and your client had the opportunity to

18  review the Presentence Investigation Report?

19          MR. HANSEN:  Yes, Your Honor.

20          THE COURT:  Could you make a record as to how you and

21  Mr. Rhodes went about reviewing this document?

22          MR. HANSEN:  Yes, Your Honor.  When the draft

23  presentence report was filed in August, we did not send it to

24  Mr. Rhodes because of the nature of the subject matter, but I

25  did go down to the Pottawattamie County Jail and review it

1   carefully with him.  I read the important parts of the

2   presentence report to him verbatim.  We developed a response

3   from that conversation.

4        The probation office incorporated our response in the final

5   version of the report.  I met again with Mr. Rhodes after the

6   final version of the report was prepared.  We reviewed it again.

7   I think we're prepared for sentencing.

8             THE COURT:  At this time do you have any outstanding

9   factual objections, corrections, or omissions to bring to the

10  Court's attention, noting that the Government -- the

11  Government's correction has been incorporated into the

12  presentence report at this time?

13            MR. HANSEN:  No, Your Honor.

14            THE COURT:  Thank you.

15       Mr. Rhodes, we've been talking about the Presentence

16  Investigation Report in this case.  Mr. Hansen explained to me

17  how he went about reviewing this document with you.

18       Do you recall going over this document with your attorney

19  as he described?

20            THE DEFENDANT:  Yes.

21            THE COURT:  Have you had a full and fair opportunity

22  to review the material contained in the report?

23            THE DEFENDANT:  Yes.

24            THE COURT:  Mr. Hansen has indicated to me that there

25  are no factual errors or corrections that need to be brought to

1   my attention.  Do you understand that?

2               THE DEFENDANT:  Yes.

3               THE COURT:  Do you agree that the report is factually

4   accurate?

5               THE DEFENDANT:  Yes.

6               THE COURT:  Thank you.

7        Based upon that record, the Court will rely upon the

8   unobjected to factual information contained in the Presentence

9   Investigation Report for determining the appropriate sentence to

10  impose in this case.

11       That brings us to a discussion of the guideline calculation

12  in this case.  Because of the multiple victims and the multiple

13  counts, there is a bit of an extensive discussion that is

14  necessary to understand the guidelines as it relates to each

15  count.  The Court will go over those at this time.  Each count

16  is a separate group because each count involves a separate

17  victim.

18       So for Group 1, Count 1, the base offense level is 28

19  because of the nature of the conviction.  Paragraph 42, there is

20  an upward adjustment of two levels because the offense involved

21  misrepresentation of the participant's identity.  For paragraph

22  43, there's an upward adjustment for two levels, again, for the

23  use of a computer or interactive service.  Paragraph 44, the age

24  of the victim is accounted for with an eight-level upward

25  adjustment because the victim had not yet attained 12 years of

1  age.   That results in adjusted offense level of 40 for the first

2  group.

3      For the second group, the second count, the second victim,

4  the base offense level is 28 based upon the nature of the

5  conviction.   There's a two-level upward adjustment, again, for

6  the use of a computer or interactive service to facilitate the

7  crime.   There's an adjusted offense level of 30 there.

8      Group No. 3, the nature of the conviction is a base offense

9  level of 28.   There's a two-level upward adjustment for

10 misrepresentation of identity.   There's a two-level upward

11 adjustment in paragraph 57 for using the computer or interactive

12 computer service.   There's a two-level upward adjustment in

13 paragraph 58 because the offense involved the commission of a

14 sex act or sexual contact.   In paragraph 59, there is an

15 eight-level upward adjustment based upon the age of the victim

16 as not yet attaining the age of 12.

17     Group 4, the victim here is Count 3A, it's a subset of the

18 Count 3 because there's a second victim in that count.   Base

19 offense level, again, is 28; two levels upward for the use of

20 computer; two-level upward because the offense involved the

21 commission of a sex act; eight-level upward adjustment because

22 of the age of the victim, not yet 12.   There's a 40 adjusted

23 offense level for that group.

24     Group 5, the distribution of child pornography, in this

25 case, the base offense level is 22 due to the nature of the

1   conviction.  And then, because the image involved a prepubescent

2   minor who had not yet attained the age of 12, a two-level upward

3   adjustment.  Knowingly engaging in distribution is a two-level

4   upward adjustment in paragraph 74.  Paragraph 75, because of the

5   pattern of activity involving sexual abuse, there's a five-level

6   upward adjustment.  And then the use of computer is a two-level

7   upward adjustment, resulting in an adjusted offense level of 33.

8       The grouping rules apply, resulting in a total number of

9   group units of 3.  The greater of the adjusted offense levels is

10  42.  There's a three-level upward adjustment because of the

11  units assigned.  The combined adjusted offense level is 45.

12  There's two levels off for acceptance of responsibility.

13      Does the Government move for the third level?

14          MS. SUDMANN:  Yes, Your Honor.

15          THE COURT:  The Court grants that motion.  That

16  results in a total offense level of 42.

17      The resulting advisory guideline range is 360 months to

18  life.  There is five years to life, a range, recommended for

19  supervised release.  Probation is not an option under the

20  guidelines or statute.  The fine is between 50,000 and 250,000

21  dollars.  Restitution has not been identified, and a $5,000

22  Juvenile Victims of Trafficking Act assessment and a $400

23  special assessment.

24      I understand the Government has no objection to those

25  calculations.

1          MS. SUDMANN:  That is correct, Your Honor.

2          THE COURT:  Mr. Hansen, I understand you do have an

3     objection to the use of the upward adjustment for the offense

4     identified in paragraphs 66 and 58, the two-level upward

5     adjustment if the offense involved the commission of a sex act

6     or sexual contact.  Is that correct?

7          MR. HANSEN:  Yes, Your Honor.

8          THE COURT:  Is that your only objection to the

9     calculations?

10         MR. HANSEN:  Yes, Your Honor.

11         THE COURT:  Thank you.

12      The Government bears the burden on that adjustment.  As I

13    stated, I read the text messages and I watched the videos

14    yesterday.  Do you have any additional evidence you'd like to

15    present on that issue?

16         MS. SUDMANN:  Yes, Your Honor.  The Government would

17    like to call Special Agent Larsen.

18         THE COURT:  Thank you.

19      Please come forward, sir.

20      Mr. Larsen, please raise your right hand and prepare to be

21    sworn.

22         ROBERT LARSEN, GOVERNMENT'S WITNESS, SWORN

23         THE COURT:  Thank you.

24      Agent Larsen, if you'd please state and spell your full

25    name for the record.

1          THE WITNESS:  Robert Larsen, L-a-r-s-e-n.

2          THE COURT:  Thank you.

3      Your witness, counsel.

4          MS. SUDMANN:  Thank you.

5      Your Honor, can I make one clarification before I start?

6          THE COURT:  Yes.

7          MS. SUDMANN:  It's my understanding in just speaking

8  with Mr. Hansen that the fact that Mr. Rhodes knew these girls

9  were Girl Scouts is still one issue he's objected to, is still

10 one factual issue he's objecting to, as he did in the objections

11 to the PSR.

12         THE COURT:  Mr. Hansen, is that correct?  My

13 understanding was that you had no outstanding factual

14 objections.

15         MR. HANSEN:  We're not objecting to the fact that

16 these -- some of the victims, the victims, were Girl Scouts.  As

17 the addendum to the presentence report indicates, our concern

18 was this speculation that Defendant may have known the girls

19 from Girl Scouts.

20     The way I read the final report, the probation office

21 incorporated our objection, and we don't have an objection to

22 the way it's written right now.

23         THE COURT:  So then if you have any additional

24 evidence you want to present on that knowledge, the way that the

25 report reads indicates that the victims or the individuals with

1   whom he contacted, one of whom was a Girl Scout troop member

2   older than his daughter.

3        In paragraph 34, "Two other girls that were involved in

4   Girl Scouts received messages from one of Rhodes' Facebook

5   accounts and reported this to their parents."  It doesn't

6   indicate the -- my understanding is that there's no fact to that

7   that he objects to, but if you have any additional information

8   that augments that material in the presentence report, you can

9   certainly provide that for 3553(a) factors.

10             MS. SUDMANN:  Thank you, Your Honor.

11                     DIRECT EXAMINATION

12   BY MS. SUDMANN:

13   Q.  Special Agent Larsen, did you begin an investigation

14   involving Mr. Rhodes?

15   A.  I did.

16   Q.  And as part of your investigation, did you determine that

17   some of the girls involved may be involved in a Girl Scout troop

18   in the Creston, Iowa area?

19   A.  Yes.

20   Q.  And as part of your investigation, did you learn that

21   Mr. Rhodes' daughter was involved in that same Girl Scout troop?

22   A.  Yes.

23   Q.  And was his wife also involved in that same Girl Scout

24   troop?

25   A.  She was as a volunteer.

1  Q.  And at some point did you receive a list of all of the girls

2  in that Girl Scout troop?

3  A.  I did.

4  Q.  And did you compare those girls with the information that

5  you had as to the people that Mr. Rhodes had contacted through

6  fraudulent Facebook accounts?

7  A.  Yes, I did.

8  Q.  And how many girls from that Girl Scout troop list had

9  Mr. Rhodes contacted?

10  A.  I identified six individuals that he had either communicated

11  with or attempted to befriend and communicate with.

12  Q.  And Child No. 3, was her mother one of the Girl Scout

13  leaders?

14  A.  Yes.

15  Q.  Special Agent Larsen, in front of you do you have Exhibit 1?

16  A.  I do.

17  Q.  And can you explain to the Court what Exhibit 1 is?

18  A.  These are videos that were identified in the Facebook

19  account of one of the victims in this case.

20  Q.  And would that be Child No. 3?

21  A.  Yes.

22  Q.  And along with the videos in Exhibit 1, did you have the

23  opportunity to review all of the messages back and forth between

24  Mr. Rhodes and Child No. 3 that was the subject of these videos

25  being sent to him?

1  A.  Yes, I did.

2  Q.  And can you identify to the Court how the conversations

3  coincide with the videos in Exhibit 1?

4  A.  Well, initially, there were some sexual questions that were

5  asked from the defendant to the victim, and then eventually it

6  evolved to a game of Truth or Dare, and basically what would

7  occur was a dare would be made and then the victim would do that

8  dare and make a video of it.

9  Q.  And so the videos that are a part of Exhibit 1, do they stem

10 from Truth or Dare requests by Mr. Rhodes to Child No. 3?

11 A.  Yes, they do.

12 Q.  And do some of those videos show Child No. 3 touching one of

13 her younger sisters?

14 A.  Yes.

15 Q.  As well as one of her younger sisters touching Child No. 3?

16 A.  Yes.

17 Q.  And is that what was requested by Mr. Rhodes?

18 A.  Yes, it was.

19 Q.  In review of Exhibit No. 2, is that images from Child No.

20 3's Facebook account?

21 A.  Yes.

22 Q.  And as far as Exhibit No. 3, is that pictures of Child No. 1

23 as well as some of the communications between Mr. Rhodes and

24 Child No. 1?

25 A.  Yes, it is.

1    Q.   And in the review of those conversations, is that just a

2    snapshot of the communications between Mr. Rhodes and Child No.

3    1?

4    A.   Yes.

5    Q.   And in regards to Child No. 1, were those conversations and

6    the use of Truth or Dare to get the child to do things he

7    wanted, is that similar?

8    A.   Yes.

9    Q.   And based on your review of all of the information between

10   Mr. Rhodes' communication with Child No. 1 and Child No. 3, was

11   Mr. Rhodes trying to get these children to do sexually-related

12   things?

13   A.   Yes.

14   Q.   And was he also attempting to get these children to do

15   things with other children?

16   A.   Yes.

17   Q.   And were those children younger?

18   A.   Yes.

19   Q.   Were they all under the age of 12?

20   A.   Yes.

21   Q.   And in regards to the videos, Exhibit 1, what was the time

22   frame that Mr. Rhodes communicated with Child No. 3 before those

23   videos were sent to him?

24   A.   He communicated with the individual for approximately seven

25   months, from the middle of January to sometime in August, before

1  he was able to get the individual to make the videos.

2  Q.  And in regards to his communications with Child No. 3, did

3  he portray himself as a female?

4  A.  Yes.

5  Q.  As a friend of Child No. 3?

6  A.  Yes, he did.

7  Q.  And did those communications progress from just being friend

8  questions to sexual in nature?

9  A.  Yes, they did.

10  Q.  And in regards to Child No. 1, in the information in Exhibit

11  3, did Mr. Rhodes portray himself as a boy?

12  A.  Yes.

13  Q.  And would you describe this relationship as a

14  boyfriend-girlfriend relationship?

15  A.  Yes.

16  Q.  Did Mr. Rhodes tell this -- tell Child No. 1 that he loved

17  her?

18  A.  Yes.

19  Q.  And this child told him that back?

20  A.  Yes.

21  Q.  And then in regards to Exhibit No. 4, regarding Child No. 2,

22  did he also portray himself as a boy?

23  A.  Yes, he did.

24  Q.  And was this also kind of a girlfriend-boyfriend

25  relationship?

1  A.  Yes.

2  Q.  This girl was older; is that fair?

3  A.  Yes.

4  Q.  Did he also have conversations with her about her touching

5  her younger niece?

6  A.  Yes.

7  Q.  Did he also have conversations with her about her father

8  being a sex offender?

9  A.  Yes, he did.

10  Q.  In all three of these conversations with these three girls,

11  did he ask them to show them -- send pictures or videos of their

12  chest area?

13  A.  Yes.

14  Q.  Without clothes on?

15  A.  Yes.

16  Q.  And did he also ask Child No. 2 and Child No. 3 to show

17  their private parts, their vaginal area?

18  A.  Yes.

19  Q.  And they did not do that, but he requested that of them; is

20  that correct?

21  A.  That is correct.

22         MS. SUDMANN:  Your Honor, I would offer Exhibits 1

23  through 4.

24         THE COURT:  Mr. Hansen, any objection?

25         MR. HANSEN:  No, Your Honor.

1              THE COURT:  Exhibits 1 through 4 are admitted.

2                        (Government Exhibit Nos. 1 - 4 were

3                         offered and received in evidence.)

4   BY MS. SUDMANN:

5   Q.  Special Agent Larsen, is it true that Mr. Rhodes

6   communicated with Child No. 3 for over a year?

7   A.  Yes.

8              MS. SUDMANN:  No further questions.

9              THE COURT:  Cross-examination, Mr. Hansen?

10             MR. HANSEN:  No, Your Honor.

11             THE COURT:  Thank you.

12        You may step down.

13                                (Witness excused.)

14             THE COURT:  Any additional evidence on behalf of the

15  Government?

16             MS. SUDMANN:  No, Your Honor.

17             THE COURT:  Any additional evidence on behalf of the

18  defense?

19             MR. HANSEN:  Not on this issue, Your Honor, no.

20             THE COURT:  Thank you.

21        Ms. Sudmann, would you like to be heard by way of argument?

22  The Government bears the burden for the upward adjustment under

23  2G1.3(b)(4).

24             MS. SUDMANN:  Yes, Your Honor.

25        Your Honor, sexual contact is the intentional touching,

1   either directly or through the clothing, of the genitalia, anus,

2   groin, breast, inner thigh, or buttocks of any person, of any

3   person, with an intent to abuse, humiliate, harass, degrade, or

4   arouse or gratify the sexual desire of any person.  I think "any

5   person" is the key in the definition of sexual contact.

6          And if you just look at Exhibit 1 in isolation, it might

7   look like innocent fun, but if you read the messages that go

8   along with those videos and that Mr. Rhodes is giving this child

9   dares to do with this child, touch your child -- touch your

10  sister's privates, and those things of those nature, clearly

11  it's an intentional act that Mr. Rhodes is trying to get any

12  person, which is Child No. 3, to do an act, clearly, if you look

13  at the communications with Child 1, Child 2, and Child 3.

14         This was certainly intentional, and his actions were, the

15  Government would argue, for one motive, and that is for his

16  sexual desire because, really, there's no other reason for him

17  to communicate with 8-, 9-, 10-year-old children to talk about

18  sexual things, to get them to do sexual things, and then, not

19  only that, to get them to touch other children and then either

20  send a picture or a video of it.

21         So the Government argues the intent is clear.  The

22  definition says "any person."  It was at the direction of the

23  defendant for a video or a picture to be sent to him, and for

24  those reasons, the enhancement should apply.

25              THE COURT:  Thank you.

1      Mr. Hansen.

2          MR. HANSEN:  Your Honor, the objection is really more

3  legal than factual to 2G1.3(b)(4)(A).  I've cited the contrary

4  decision from the Ninth Circuit in the Basa case.

5      I think our argument is reasonable too that the way the

6  guideline is structured, it doesn't explicitly say who has to do

7  the sexual contact or sexual act, and when you have two

8  reasonable interpretations, I do think the rule of lenity comes

9  into play, and it comes into play in favor of Mr. Rhodes.

10     As I noted in the footnote to my brief, it's not actually

11  clear that this has an impact on the guideline range.  It could

12  become relevant down the road, as we saw with drugs minus two,

13  if the guidelines would change, and that's the way it would be

14  relevant.

15     But I think where you have two competing interpretations,

16  the defendant's should rule the day, so we're asking the Court

17  to sustain the objection.

18          THE COURT:  Thank you.

19     The question here is whether or not the evidence

20  establishes by preponderance that this offense involved the

21  commission of a sex act or sexual contact.  That's the language

22  used in 2G1.3(b)(4)(A).

23     The Court has reviewed the videos, and from a factual

24  matter first, it's clear that the intent here was to arouse or

25  gratify the sexual desire of the defendant through the

1  intentional touching by the first victim to the second victim,

2  the older child to the younger child, either directly or through

3  the clothing of the other child with their genitalia, breast,

4  buttocks.

5      The video is clear that the children don't know that what

6  they're doing is sexual.  The victims themselves, as the

7  Government suggested, appeared to be thinking this is some sort

8  of a game.  That doesn't minimize or diminish the purpose and

9  intent reflected in the text messages or the Facebook messages

10  that these requests were made for the sexual gratification of

11  the defendant.  So factually, it's clear that this was sexual

12  contact that was intentional and it was directed by the

13  defendant.

14      Under the guidelines, 1B1.3(a)(1)(A), the defendant is held

15  accountable for the specific offense characteristics that

16  include not only the acts or omissions committed by the

17  defendant, but also those aided and abetted, counseled,

18  commanded, induced, procured, or willfully caused.  That

19  language undermines the defense arguments and makes it not a

20  reasonable alternative to the Government's position.

21      The language in the guideline says the offense involved the

22  commission of a sex act.  It does not say the defendant

23  committed a sex act.

24      For these reasons, the Court overrules the objection to the

25  two-level upward adjustment for the offense involving the

1  commission of a sex act.  I find the reasoning put forth in the

2  Ninth Circuit's Basa opinion to be persuasive as well and would

3  follow that well-reasoned opinion independent of the analysis

4  I've already outlined if I find that persuasive.

5      Any additional record in this regard?

6          MS. SUDMANN:  No, Your Honor.

7          MR. HANSEN:  No, Your Honor.

8          THE COURT:  With that, the objection to the guidelines

9  calculation is overruled, and the Court will look to the

10  guideline calculation as previously stated for the determination

11  of the appropriate sentence to impose in this case.

12      I don't believe either party sought a traditional

13  departure.  Is that correct?

14          MS. SUDMANN:  Yes, Your Honor.

15          MR. HANSEN:  Correct, Your Honor.

16          THE COURT:  Which brings us to the ultimate issue in

17  the case, the appropriate disposition.

18      Before we go to any additional evidence on that regard,

19  would you like to read the victim impact statements at this

20  time?

21          MS. SUDMANN:  Yes, Your Honor.

22          THE COURT:  Do you have copies of the statements that

23  you could provide to the court reporter?

24          MS. SUDMANN:  Can I give them after?  I have three of

25  them.  I just don't have one of them.

1        THE COURT:  That's fine.  What you have would be

2   helpful, I'm sure.

3        MS. SUDMANN:  The first one is from Andrew Turner.

4   "As a veteran and a Marine, honor and honesty are things I

5   hold in very high regard.  Being deceitful by posing as another

6   does not just make the liar look poorly, it has the potential to

7   tarnish the character and good standing of those whose identity

8   was stolen.

9   "I am appalled to learn of the events that unfolded, and it

10  made it worse to learn how the identity of my friend and his

11  family as well as my own was highjacked and used to help this

12  man victimize others.  As this man does not seem to know what

13  honor or honesty is, it is my opinion that he is not suited to

14  be around my family, friends, or the general public for a long

15  time."

16       The statement from Andrew Rothe:  "Brian and I have known

17  each other for a long time.  We were friends for almost 15

18  years.  Back in 2016, I cut ties with him, blocked him on social

19  media, stopped all communication.  The reason for this was

20  because I felt that our relationship was a toxic one.  If Brian

21  didn't get his way, he would whine.  He could guilt-trip me into

22  doing just about anything for him.  He also accused my wife,

23  fiancee at the time, of abusing his daughter when all she did

24  was take a toy away from the child because she was not

25  listening.  My wife was babysitting.

1    "All of these things piled on top of each other made me

2  decide to cut him out of my life.  I held no hard feelings.  If

3  I ran into him in public, I would say hi and I would talk to

4  him.

5    "It wasn't until June 6th of 2018, when Brian got arrested

6  by the Creston Police Department and I got a phone call asking

7  for me to come in and talk to the police because I was being

8  accused of hacking.  I was not told over the phone who was

9  accusing me.  It wasn't until I went to the PD the next morning

10 that I found out it was Brian.  I made my statement very similar

11 to what I have stated above and I went home.

12   "After that day, I avoided Brian every time I ran into him.

13 I was pissed.  How could he accuse someone that he used to

14 consider a friend of doing such a thing?

15   "A few months later, I was contacted by an Iowa Division of

16 Criminal Investigation agent.  He took my statement again, and

17 we discussed a few unsavory interactions that I had with Brian

18 since the arrest.

19   "One day, when I avoided him at Walmart, he texted me and

20 e-mailed me with very angry messages stating that whatever the

21 cops said was a lie and I should trust him.  After that

22 interaction with the Iowa DCI, I did not have any more issues

23 with Brian.

24   "I currently am employed at a K through 12 public school.

25 The possibility of my employer or current student families

1   hearing slander as presented by this case could affect my

2   current position, my future career, my ability to provide for my

3   family.  As such, this deeply hurt me when it was presented as

4   such.  Even without the current investigation into Brian's

5   activities, I would choose to avoid him due to his attempted

6   slander of my name and the grief he has caused my family."

7           THE COURT:  Ms. Sudmann, I need to understand who this

8   person -- who that person is.  One of the identities used in

9   this case had a last name of Rothe.  Is that the same last name?

10          MS. SUDMANN:  Yes, Your Honor.  So Andrew Rothe, his

11  ex-wife is Amy Brenizer, and his 8-year-old child is S█████

12  R████.

13          THE COURT:  And so the individual that was portrayed

14  as the 8-year-old child who talked to Mr. Jameson was this

15  individual's child, and the mother that was purported to be

16  talking to Mr. Jameson was his ex-wife?

17          MS. SUDMANN:  Ex-wife and real mother of S█████ R█████.

18          THE COURT:  Thank you.

19          MS. SUDMANN:  And to further explain, when Mr. Rhodes

20  was interviewed about this, he blamed Andrew Rothe had hacked

21  him.

22      The third statement is from Victim No. 1's mother.

23      "As a little girl, I remember sending to someone that went

24  to prison for raping me a forgiveness letter so today I am

25  sending you one.  I forgive you for what you have done.

1    Although you have changed my daughter's life and she is not the

2    same little girl I knew before, I am truly thankful that you

3    can't do this to any more children.

4        "I am saddened that your wife and daughter has gone through

5    so much.  I have sent her prayers a few times, and I know she

6    has had a hard time believing, but what I do know is that I

7    asked God if this was really the person he would help.

8        "It broke my heart that this could happen to my daughter,

9    but I am still sitting here thankful that she has not been

10   through what I went through."

11       The last statement is regarding Child No. 3.  "I have

12   admittedly put off writing this impact statement.  How do I

13   explain just how much this evil has hurt my daughter and family?

14   Well, I just don't have those words.  But what I can say is

15   this:  You did hurt my family.  That hurt can never be erased.

16   But you also hurt your own.

17       "See, this isn't one of those cases where the perpetrator

18   is some faceless person on the other side of a computer screen.

19   We actually know you.  Our kids are friends.  I'm your

20   daughter's Girl Scout leader.  You worked for me.  So I think

21   you intentionally targeted my kids.  Yes, I do, because you used

22   your wife's access to my Girl Scout Facebook page.  Whether you

23   admit this or not, I know that's what happened.

24       "And when I say 'my kids,' I mean my daughter and my Girl

25   Scouts because those girls are my girls.  My 9-year-old is

1   friends with your child, and I love your child dearly.  And

2   almost weekly both girls ask when can my daughter go to your

3   daughter's house to play, and that answer is, honestly, never.

4         "See, you are only going to be punished with a few years in

5   prison.  These kids will have to live with this punishment for

6   the rest of their lives, and they really didn't do anything

7   wrong.

8         "Because we don't know where every copy of those photos

9   have gone so we will never be able to get rid of them.  What is

10  going to happen when P██████ is 30 or 40 applying for college and

11  jobs, getting married and starting her life?  Well, these photos

12  are still out there and can still hurt her.

13        "It has already caused her to be investigated as a sexual

14  predator because you convinced her to take an inappropriate

15  picture of her 3-year-old sister.  But just because she was

16  cleared of being at fault doesn't mean that is forgotten.  It

17  will forever be on her record so she will have to explain again

18  and again about the time she was an innocent and naive child

19  that was solicited online.

20        "So you will serve whatever time you are given because it

21  will never be enough.  These children will be the ones to be

22  actually punished for the rest of their lives all because they

23  are just that, innocent and naive children."

24              THE COURT:  Does that conclude the victim impact

25  statements?

1          MS. SUDMANN:  Yes, Your Honor.

2          THE COURT:  Did the Government have any additional

3  evidence to present?

4          MS. SUDMANN:  No additional evidence.

5          THE COURT:  Mr. Hansen, any evidence on behalf of the

6  defense?

7          MR. HANSEN:  Your Honor, I would move for the

8  admission of the letters of support, Exhibits A-1 through A-5.

9          THE COURT:  Has there been any objection?

10          MS. SUDMANN:  No, Your Honor.

11          THE COURT:  Those are admitted.

12                    (Defendant's Exhibits A-1 - A-5 were

13                     offered and received in evidence.)

14          MR. HANSEN:  No other evidence, Your Honor.

15          THE COURT:  Would you like to be heard by argument,

16  Mr. Hansen?

17          MR. HANSEN:  Yes, Your Honor.

18      This is, no doubt, a serious offense, and I know Mr. Rhodes

19  has a lot of remorse about what happened.  There's no way around

20  it, it's a very serious offense.  Whatever the Court does here

21  today with the statutory limitations, it's going to be a serious

22  sanction, especially for someone who's never been incarcerated

23  before.

24      What we're asking the Court to do is to vary downward

25  toward the statutory minimum for a term of imprisonment but also

1    impose a life term of supervised release.  This is a serious

2    sanction, again, for someone who has never been in prison

3    before.  It's a serious sanction to the public.  He'll go to

4    prison for at least ten years and will be on supervised release

5    for the rest of his life.

6        As the Court knows, supervised release is very difficult

7    for anybody.  It's very difficult for anybody to be on

8    supervised release for life, and it's especially difficult for

9    someone with conditions related to sex offenses to be on

10   supervised release for life.

11          THE COURT:  You don't object to any of the conditions

12   proposed?

13          MR. HANSEN:  Correct, Your Honor.

14       So the public will be protected by such a sentence.

15   Mr. Rhodes will be under supervision for the rest of his life,

16   and it will be a serious, serious sanction for what he did.

17       This proposal is also reflective of some of the mitigating

18   factors.  And, obviously, there are many aggravating factors,

19   but I have outlined the mitigating factors in Mr. Rhodes'

20   sentencing memo.

21       He himself went through a difficult childhood with

22   difficult things happening to him.  Those are not excuses for

23   what happened here, but I think they do go some way to

24   explaining the thinking and the conduct of what got us where we

25   are today.

1       Again, he's an individual who hasn't been in enough trouble

2   before to ever be incarcerated so a sentence of imprisonment,

3   even toward the minimum, is going to be very meaningful to him,

4   and I do think in whole this is a sentencing proposal that

5   reflects all of the considerations the Court must keep in mind

6   under Section 3553(a).

7       So that's our proposal, Your Honor.

8           THE COURT:  Thank you, Mr. Hansen.

9       Mr. Rhodes, now is the time during the hearing where you

10  have the opportunity to speak.  You do not have to say anything,

11  but if you'd like to, the Court will consider it.

12      Is there anything you'd like to say, sir?

13          THE DEFENDANT:  No, Your Honor.

14          THE COURT:  Thank you.

15      Ms. Sudmann, on behalf of the United States.

16          MS. SUDMANN:  Thank you, Your Honor.

17      The Government is asking for a sentence within the

18  guideline range for three reasons.

19      First of all, Mr. Rhodes has victimized numerous people in,

20  I'll call it, two separate cases that were investigated

21  simultaneously.  He victimized children online; not nameless

22  people he didn't know, these were children that were all somehow

23  related to somebody he knew.  Several of them were involved in

24  Girl Scouts, the same kind of activity his own child was

25  involved in.

1    He represented himself as a boy wanting to be their

2  boyfriend, he represented them as a girl trying to be their

3  friend, all talking the typical grooming behaviors and talking

4  about sex and getting them comfortable with talking about sex

5  and then asking them to send pictures, send videos.

6    But the worst thing that he did is that he then was trying

7  to persuade them to touch other children; not just be a

8  boyfriend or girlfriend, but then touch the younger siblings or

9  the younger nieces that were with these kids, and got Victim No.

10  3 to do those things.  And, as the mother said, that child was

11  investigated.

12    Their innocence is forever taken from him because of his

13  actions.  The fact that he portrayed himself as someone else, a

14  kid, and had told -- Victim No. 1 told him that they loved them,

15  Victim No. 2 told him that they loved them, and he told them

16  that back.  It's just taken away things that kids do on a

17  continuum in their life, and it was taken away by an adult man

18  who had children of his own, a child of his own.

19    But not only that, Mr. Rhodes victimized adults too.  For

20  whatever connection Andrew Rothe, Andrew Turner, Amy Brenizer,

21  S████ R████, and Ellen Seddon had with Mr. Rhodes, he made all

22  those Facebook accounts under their names, real people and real

23  lives in the community he lives in, and then took those -- took

24  those Facebook accounts, and what did he do?  He sought out

25  children to talk sexual things with.

1    Also one of his adult victims, quite honestly, is

2  Mr. Jameson because he sought Mr. Jameson out as well under two

3  of these Facebook accounts, sent him child pornography.  He

4  pretended to be an 8-year-old girl that is a real 8-year-old

5  girl and her mother and sent disgusting conversations,

6  essentially talking about raping an 8-year-old girl, all while

7  having the same age child in his home.

8    Not only that, he sent child pornography.  He used Facebook

9  and sent Mr. Jameson an image of child pornography, pretending

10  to be, actually, again, a real 8-year-old child that's involved

11  in this.

12    His actions are horrible, and it's just -- the Government

13  would submit that Mr. Rhodes doesn't necessarily have remorse of

14  his actions, he has remorse that he got caught, because he

15  victimized so many people in this case.

16    And for those reasons, the Government is asking for a

17  sentence within the guideline range.

18        THE COURT:  The Court is required to consider a number

19  of factors before deciding on an appropriate sentence in this

20  and every case, and those factors are set forth in Title 18,

21  United States Code, Section 3553(a).  They include the

22  defendant's history and characteristics and the nature and

23  circumstances of the offense.

24    The Court must also consider the need for the sentence

25  imposed to reflect the seriousness of the offense, to promote

1   respect for the law, to provide just punishment, to adequately

2   deter future criminal conduct both for this defendant and for

3   others who might commit a similar crime in the future.

4       The Court has to consider the need to protect the public

5   and to provide the defendant with needed educational, training,

6   or other needs in the most effective manner.

7       The Court has to consider the sentencing guidelines and the

8   advice they provide, as well as the need to provide restitution

9   to any victims of the offense.

10      I may not speak about each one of the statutory

11  considerations specifically.  In determining the appropriate

12  sentence to impose, I have considered each and every one of

13  them.

14      To be clear, I may not state each and every one of the

15  statutory considerations specifically in articulating the

16  reasoning behind my sentence, but in determining the appropriate

17  sentence to impose, I have considered each and every one of

18  them.  Ultimately, the sentence the Court imposes must be

19  sufficient but not greater than necessary to serve those

20  purposes of sentencing.

21      As both parties acknowledge, this is an incredibly serious

22  offense, but use of the singular is not appropriate here.  These

23  are incredibly serious offenses.  The guidelines are as high as

24  they are because of the fact that there are multiple victims in

25  this offense, in these crimes, and each one of the individuals

1  involved, some of whom are not accounted for in the guidelines

2  in terms of the adult victims whose identities were taken as

3  part of the commission of this crime, and the seriousness of the

4  offense must be reflected in the sentence imposed.

5       The nature and circumstances of these offenses are

6  egregious.  These are multiple live victims, all of whom, it

7  appears, had some connection with the defendant or his family.

8  The crimes involved planning, execution, and deception.  He

9  interacted with some of the victims in this case for over a

10  year.

11       The communications involved were incredibly manipulative.

12  Looking at the interactions with Victim No. 1, that

13  communication lasted a short period of time relatively.  Again,

14  he appeared as a 16-year-old boy.  This child was 11 years old,

15  and he is encouraging her in these Facebook exchanges to

16  sexually victimize her niece.

17       The second victim, who is 17 years old, was encouraged to

18  sexually victimize her niece, who was identified as 2 years old,

19  and when told it was 2 years old, the response from the

20  defendant was -- the text exchange with the 17-year-old girl

21  was, "Am I allowed to see your niece's privates if I want to?"

22       The response was, "She is 2 years old."

23       And the response:  "I know.  LOL.  I'm just asking.  LPL.

24  So is that allowed?"

25       The victimization of a 17-year-old was not enough.  The

1 victimization of an 8-year-old was not enough.  He used those

2 victims to create new victims, and the impact on those children

3 is real.

4      As the Court said in ruling on the issue of the sexual

5 contact adjustment, it's clear from this video that the older

6 child, although she was given very graphic instructions and very

7 graphic descriptions of what they wanted -- what the defendant

8 wanted her to do, even with the graphic description, these

9 children are not sexually deviant, and you can tell that they

10 did not grasp the gravity of what was being asked of them.

11      They now do, undoubtedly, understand that putting your hand

12 down the pants of your sister who is 3 or having your younger

13 family member drop their pants so you can take a picture of

14 their bottom, that those things are sexual for other people, and

15 they now know that, and they know that they've been a part of

16 that, and they can't ever change that.

17      The communications on these Facebook chats indicate that

18 this defendant is a threat to the public, and the need to

19 protect the public is at the forefront of the Court's sentencing

20 consideration.

21      All of this I have just discussed is separate from the very

22 serious crime of distribution of child pornography.  The

23 defendant, in sending to Mr. Jameson the picture of an

24 8-year-old girl, the same age as his own child, in a lascivious

25 pose displaying her vaginal area and her breasts, that

1  distribution in and of itself is serious.

2       Whoever that child is, wherever she is, is a victim, and

3  the exchanges about the child, the fact that this was

4  represented to be a child that the defendant knows both of the

5  parents of and that he used the names involved, makes it even

6  more egregious.

7       But the indication that the defendant wanted this child to

8  be raped and to have Mr. Jameson commit that sex offense and to

9  keep going regardless of the hurt to the child demonstrates a

10 level of depravity that, again, militates in favor of a very

11 long sentence to protect the public, promote respect for the

12 law, and reflect the seriousness of the offense.

13      The mitigating factors here, the Court also considers, and

14 that is why the Court isn't imposing consecutive sentences.  The

15 mitigation includes, in paragraph 101, the fact that this

16 defendant was victimized as a child; the fact that he was

17 exposed to child porn and pornography at a young age, as young

18 as the age of 11; that he was aware of abuse conducted by family

19 members against family members; and also, as reflected in

20 paragraph 105, that he has been providing assistance and care

21 and support to his mother, who has physical ailments, and that's

22 also reflected in Exhibit A-1.  The Court considers those

23 mitigating factors in determining the sentence to impose.

24      Counsel, do you know of any legal reason why the Court

25 should not impose sentence at this time?

1          MS. SUDMANN:  No, Your Honor.

2          MR. HANSEN:  No, Your Honor.

3          THE COURT:  Then based upon the Court's review of the

4   criteria set forth in Title 18, United States Code, Section

5   3553(a) and the circumstances of this case, and for the reasons

6   I have explained, it is the judgment of the Court that the

7   defendant, Brian Lee Rhodes, is sentenced to, on Count 1, 360

8   months of imprisonment; on Count 2, 360 months of imprisonment;

9   on Count 3, 360 months of imprisonment; and on Count 5, 240

10  months of imprisonment.  Those sentences will all be served

11  concurrently, or at the same time, for a total of 360 months of

12  imprisonment.

13         On each one of those counts, the Court will impose a

14  15-year term of supervised release.  The Court will also impose

15  the $400 special assessment and the $5,000 JVTA assessment as

16  well.

17         The Court notes that this sentence is at the bottom of the

18  advisory guideline range.  With this number of victims and the

19  nature and circumstances of this offense, a more serious

20  sentence, a lengthier sentence, consecutive sentences, stacking

21  360 months on top of each other, would certainly be warranted.

22         But for the mitigating factors highlighted by the defense,

23  including the defendant's own trauma suffered as a child and the

24  positive contributions he's made to his mother, the Court would

25  have given a lengthier sentence, including potentially

1   consecutive sentences or at least partially consecutive

2   sentences.

3       The range includes up to life imprisonment, and that

4   certainly is a sentence that would not be unwarranted under

5   these facts in light of the real danger to the community and the

6   seriousness of the offense and the need to protect the public.

7       The Court does not impose a fine.  The Court is imposing

8   the $5,000 victim assessment and is prioritizing that over the

9   imposition of a fine.  Restitution has not been sought, and for

10  that reason, the Court does not impose it at this time.

11      In terms of the term of supervised release, Mr. Rhodes,

12  within 72 hours of release from the custody of the Bureau of

13  Prisons, you'll be required to report in person to the probation

14  office in the district to which you are released.

15      While on supervised release, you shall not commit another

16  state, federal, or local crime; you shall not unlawfully possess

17  a controlled substance; and you shall not use a controlled

18  substance.  You are a felon.  You cannot possess a firearm,

19  destructive device, or ammunition either during your time of

20  supervised release or anytime thereafter.

21      You'll be required to cooperate in the collection of DNA

22  and abide by all sex offender registry regulations where you

23  live, work, or go to school.

24      You'll be required to abide by the standard conditions of

25  supervised release as set forth by the United States Sentencing

1  Commission, plus the special conditions of supervised release

2  that were recommended by the probation office and were

3  unobjected to by the defense.  Those include the paragraphs

4  listed in Part G, and I'll briefly summarize those for you now.

5       The requirement that you participate in sex offender

6  treatment, which will include polygraph examinations and any

7  other treatment that's recommended.

8       You will be required to refrain from associating with

9  anyone engaged in the exploitation of minors.

10      You must not have any direct contact with any child you

11 know or reasonably should know to be under the age of 18.  If

12 your contact is approved, you must comply with any conditions or

13 limitations on the contact.

14      You must not access the Internet or use any Internet-

15 capable devices.  If you're approved for such use through

16 employment by the probation office, you'll be required to

17 disclose to that employer the restrictions.

18      You must not view or possess any visual depiction of

19 sexually explicit conduct.

20      You'll be subject to a search condition as well.

21      These conditions are -- in addition, you'll be required not

22 to have any contact with the victims of this case or the

23 victims' families without the prior permission of the probation

24 officer.

25      I want to be clear, and we can include in the judgment the

1    indication the Court considers those individuals whose

2    identities were stolen to be victims as well.  These are not

3    hypothetical individuals.  These aren't made-up names.  These

4    are real people, and those people are proximately harmed by this

5    conduct, and for that reason, those individuals are included in

6    that no contact in addition to the juveniles and the juvenile

7    families reflected in the child victims and Victims 1, 2, 3, and

8    Victim 3's siblings, the nieces referenced, and then also the

9    adults whose identities were taken.

10        The Court is imposing these conditions after an

11   individualized assessment of the defendant's supervision needs

12   and after reviewing and considering each of the relevant factors

13   under 3553(a) and 3563(b).  Clearly, this conduct warrants these

14   conditions to adequately protect the public while he's on

15   supervision.

16        Mr. Hansen, any requests as to designation or programming?

17            MR. HANSEN:  Yes, Your Honor.  Mr. Rhodes would

18   appreciate a recommendation that he serve his sentence at the

19   facility at Marion, Illinois, and that he be afforded the

20   opportunity to participate in the residential sex offender

21   treatment program available there.

22            THE COURT:  And the Court will include that

23   recommendation to the Bureau of Prisons.

24        Forfeiture?

25            MS. SUDMANN:  Yes, Your Honor.  Based on the plea

1  agreement, the Government would ask the Court to order

2  forfeiture of the items related, as well as dismiss Count 4.

3        THE COURT:  And those are dismissed -- the Count 4 is

4  dismissed, and the forfeiture will be included in the final

5  judgment as well.

6     Oh, I also should note that we made the determination about

7  the sexual conduct and the use of the adjustment under the

8  guidelines for the sexual conduct.  Mr. Hansen indicated that it

9  may not have had any impact on the guidelines and that there

10 would potentially -- the only potential impact it would have

11 would be in the future if the guidelines were changed.

12    Whether or not the actions reflected in Exhibit 1 against

13 Victim 3 and her siblings qualified as a sex offense or as

14 sexual conduct or under that guideline section, the Court would

15 impose the same sentence.  The facts and circumstances of the

16 case warrant a 360-month sentence on the three counts on which

17 it was imposed and the 240-month sentence, the maximum

18 potential, on the fourth count.  This is a serious offense, and

19 the Court would impose the same sentence whether or not I erred

20 in determining that two-level upward adjustment was

21 appropriately imposed.

22    Mr. Rhodes, you do have the right to appeal the sentence

23 that I have just imposed.  If you wish to pursue an appeal, you

24 must file a written notice of appeal within 14 days of the entry

25 of judgment.

46

1      Do you understand the time limit for filing a notice of

2  appeal, sir?

3            THE DEFENDANT:  Yes.

4            THE COURT:  In addition, if you wish to pursue an

5  appeal and you cannot afford an attorney, one can be appointed

6  to represent you.  You can also have transcripts of this or any

7  other relevant proceedings made at no cost to you in furtherance

8  of your appeal if you qualify financially.

9      Do you understand your appeal rights, sir?

10            THE DEFENDANT:  Yes.

11            THE COURT:  Counsel, any matters I failed to address?

12            MS. SUDMANN:  No, Your Honor.

13            MR. HANSEN:  No, Your Honor.

14            THE COURT:  Anything further on behalf of the

15  Government?

16            MS. SUDMANN:  No, Your Honor.

17            THE COURT:  On behalf of the defense?

18            MR. HANSEN:  No, Your Honor.  Thank you.

19            THE COURT:  The defendant is committed to the custody

20  of the United States Marshals Service for transportation to the

21  designated Bureau of Prisons facility.

22      Mr. Rhodes, I wish you the best moving forward, sir.

23      That will conclude the hearing.

24            (Proceedings concluded at 12:04 p.m.)

25

1          C E R T I F I C A T E

2      I, Kelli M. Mulcahy, a Certified Shorthand Reporter of the

3  State of Iowa and Federal Official Realtime Court Reporter in

4  and for the United States District Court for the Southern

5  District of Iowa, do hereby certify that the foregoing is a true

6  and correct copy of the transcript originally filed with the

7  clerk of court on November 13, 2019, and incorporating the

8  redactions of personal identifiers in accordance with Judicial

9  Conference policy as requested by attorney of record Brad

10  Hansen.  Redacted characters appear as a black box in the

11  transcript.

12      Dated at Des Moines, Iowa, this 2nd day of December, 2019.

13

14

15                    /s/ Kelli M. Mulcahy
                   Kelli M. Mulcahy, CSR, RDR, CRR
16                   Federal Official Court Reporter

17

18

19

20

21

22

23

24

25